UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

KAY XANTHAKOS,                                          17 Civ. 9829 (DAB)(GWG)

        Plaintiff,

                                       AMENDED COMPLAINT

    - against -

CITY UNIVERSITY OF NEW YORK, JUDITH
BERGTRAUM, ROBERT LEMIEUX, and ALI          PLAINTIFF DEMANDS A
VEDAVARZ,                                                      TRIAL BY JURY

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

        Plaintiff Kay Xanthakos ("Xanthakos" or "plaintiff"), by her attorneys, Vladeck,

Raskin & Clark, P.C., complaining of defendants City University of New York ("CUNY"), Judith

Bergtraum ("Bergtraum"), Robert Lemieux ("Lemieux"), and Ali Vedavarz ("Vedavarz")

(collectively the "individual defendants" and, with CUNY, "defendants"), alleges:

NATURE OF CLAIMS

        1.      Women are paid less than men for equal work. The pay gap is significant for

licensed architects. Architecture, despite nearing parity for graduation rates from architecture

programs, remains a male-dominated profession. Less than 20% of licensed architects are women.

Full-time female architects still earn about 20% less than male architects. Xanthakos has been paid

substantially less than even men without a license and with less education and experience.

        2.      New York State has recognized that pay equity for women is a serious

problem that must be addressed and has taken steps to remedy the ongoing discrimination. Its

efforts, however, have overlooked a major segment of the economy – its own existing workforce.

933269 v1

In 2015, New York State amended its Equal Pay law to provide greater protection for private-sector employees. This year, the Governor signed executive orders designed to eliminate pay discrimination when state entities set starting pay for new employees, and demanding pay data by gender, race and ethnicity from state vendors. All these positive steps exclude existing employees of state entities. The gaps in the system make it easier for an entity such as CUNY – which was found to systemically pay women less than comparable men almost 25 years ago – to disregard its pay equity obligations.

3.     Xanthakos, who has worked for CUNY for over twenty years as the University Chief Architect, has been paid less than men with narrower responsibilities, including men with far fewer credentials than she has. Xanthakos's repeated requests for pay equity have been rebuffed by CUNY, which has retaliated by diminishing her work and excluding her from projects and meetings.

4.     This proceeding is brought to remedy discrimination on the basis of sex in the terms and conditions of employment and retaliation for opposition to unlawful practices, in violation of Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681 et. seq. ("Title IX"); Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq. ("Title VII");Section 1983 of the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983"); the New York State Human Rights Law, New York Executive Law § 290 et seq. (the "Executive Law"); and the Administrative Code of the City of New York § 8-101 et seq. (the "City Law"), and to remedy discrimination on the basis of sex for defendant CUNY's failure to pay male and female employees equal wages in violation of the Equal Pay Act, 29 U.S.C. § 206(d) (the "EPA").

5.     Plaintiff also brings claims for retaliation for her opposition to failures to address disability accommodation in public accommodations under the Americans with Disabilities

Act of 1990, 42 U.S.C. § 12101 et seq. (the "ADA"); the Rehabilitation Act of 1973, 29 U.S.C.

§ 701 et seq. (the "Rehabilitation Act"); the Executive Law; and the City Law.

6.  Plaintiff seeks injunctive and declaratory relief, compensatory, liquidated,

and punitive damages, and other appropriate legal and equitable relief.

JURISDICTION AND VENUE

7.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331.  The Court has

supplemental jurisdiction over the claims brought under the Executive Law and the City Law

pursuant to 28 U.S.C. §§ 1367.

8.  Pursuant to § 8-502(c) of the City Law, concurrently with filing this

Amended Complaint, plaintiff served a copy of the Amended Complaint on the City of New

York Commission on Human Rights and the Corporation Counsel of the City of New York.

9.  On December 5, 2017, plaintiff filed a charge of discrimination against

CUNY with the United States Equal Opportunity Employment Commission (the "EEOC").

Plaintiff received a notice of right to sue from the EEOC on April 23, 2018.

10.  Venue is proper in this District pursuant to 42 U.S.C. § 2000e-5(f)(3) and

28 U.S.C. § 1391 because the unlawful practices complained of herein occurred within the

Southern District of New York.

PARTIES

11.  Xanthakos has worked for CUNY since March 1996 as the University Chief

Architect.

12.  Defendant CUNY is a publicly-funded university system, comprised of

senior and community colleges, graduate and professional schools, research centers, institutes and

consortia. Its headquarters and principal place of business is Manhattan. Upon information and belief, CUNY receives federal financial assistance.

13.     Defendant Bergtraum has been Vice Chancellor for Facilities, Planning, Construction, and Management ("FPCM") at CUNY since in or about August 2015, after serving as Interim Vice Chancellor for about a year. Before that, she was Deputy to the prior Vice Chancellor. At all relevant times, Bergtraum acted under color of state law.

14.     Defendant Lemieux has been Executive Director of the Department of Design Construction and Management ("DDCM") since 2007. Lemieux reports to Bergtraum. At all relevant times, Lemieux acted under color of state law.

15.     Defendant Vedavarz has been Director of Engineering Services in DDCM since 2008. Vedavarz reports to Lemieux. At all relevant times, Vedavarz acted under color of state law.

FACTUAL ALLEGATIONS

<u>Background</u>

16.     Xanthakos earned an A.B. cum laude in Fine Arts from Harvard University/Radcliffe College in 1972 and a Masters of Architecture from Columbia University Graduate School of Architecture and Planning in 1976. She has participated in numerous training programs since then, including a Project Management Program at the Harvard Graduate School of Design and a Leadership and Management course at the Baruch College Graduate School of Business.

17.     Xanthakos is a licensed architect in New York state and is LEED (Leadership in Energy and Environmental Design) certified.

18.     For 15 years, Xanthakos worked as an architectural designer and project architect/project manager for a series of architectural firms, including 11 years at David Smotrich & Partners.

19.     From 1993 to 1996, Xanthakos worked at the New York City Department of General Services, rising to become Acting Deputy Assistant Commissioner.  In that role, she oversaw a portfolio of over $470 million in capital construction for several city agencies and supervised a staff of over 70 employees, including architects, engineers, project managers and administrative support.

20.     CUNY hired Xanthakos in March 1996 to be the University Chief Architect, Assistant Director.  The position is in DDCM, within the FPCM division.

21.     Over the course of Xanthakos's career at CUNY, she has managed the design of major capital new building projects, including the Baruch Academic Complex ($320 million), the Graduate Center ($220 million), the Medgar Evers Academic Building 1 ($180 million), the Medgar Evers Student Support Services Building ($22 million), and the Queensborough Holocaust Center ($7 million); overseen the design and construction of new and renovated facilities and supervised Project Managers at 7-12 CUNY campuses concurrently; rewritten the CUNY-wide Consultant Design Guidelines; developed and conducted professional staff development programs for architects, engineers, planners, and administrators; developed record-retention guidelines for each department within FPCM; and provided technical assistance to CUNY attorneys about issues relating to the ADA.

Management

22.    When Xanthakos began working at CUNY, Lia Gartner ("Gartner") was

the Director of DDCM and Emma Macari ("Macari") was the Vice Chancellor in charge of

FPCM.  Both were licensed architects.

23.    During the time Gartner was Director of DDCM, there were usually three

female Assistant Directors.

24.    Under Gartner's leadership, the key group was Project Management.

Gartner also oversaw procurement and financial management.

25.    Assistant Directors in Project Management primarily implemented

protocols for the design of capital projects for several CUNY colleges.

26.    While Xanthakos reported to Gartner, Xanthakos directly managed the

design of large projects at several CUNY campuses, supervised Project Managers working on

projects of various sizes, and focused on design, schedule, and budget.

27.    Xanthakos's duties remained the same under the two Directors who

followed Gartner, both of whom were licensed architects.

28.    In 2007 Iris Weinshall ("Weinshall") became Vice Chancellor for FPCM.

Bergtraum joined CUNY shortly therafter as Weinshall's Deputy.

29.    Weinshall greatly expanded the staff in FPCM, including adding

Executive Director and Director positions to FPCM and DDCM.  Many of those hired were not

licensed architects or engineers.

30.    Weinshall hired Lemieux to be Executive Director of DDCM.  Lemieux is

not licensed.

31.     Xanthakos reported to Lemieux, as did the other Assistant Directors and the Directors in DDCM.

32.     From 2008 until the end of 2015, all of the Directors and Assistant Directors hired in DDCM were men.  During the same time period, there were only two women in DDCM at the level of Assistant Director, including Xanthakos, and there were no female Directors.

33.     In or about February 2008, Lemieux hired Vedavarz to be Director of Engineering Services.

34.     Since 2008, all of the engineering services staff hired were men.

Changes Under Lemieux

35.     In one-on-one meetings, Lemieux was hostile to Xanthakos, and made disparaging comments about Gartner's abilities.  Lemieux did not make disparaging comments to Xanthakos about the abilities of men who used to work in DDCM.

36.     In or about June 2008, Bergtraum and Lemieux told Xanthakos that they would like to re-focus her role to concentrate on CUNY-wide initiatives, including developing architectural standards, overseeing a certificate of occupancy/public assembly program, developing and implementing a records management policy, developing a professional development program, and coordinating with CUNY attorneys to address issues relating to the ADA and respond to concerns raised by the U.S. Office of Civil Rights.  They also said that Vedavarz would be her supervisor.  Xanthakos welcomed the opportunity to have university-wide responsibility.

37.     Although Vedavarz became Xanthakos's supervisor, she has remained the University Chief Architect and Assistant Director in DDCM.

38.     Xanthakos works independently.  Vedavarz does not closely supervise her.

39.     Xanthakos's CUNY-wide responsibilities require her to work closely with other departments within CUNY.  She also continued to review significant projects early in the design phase.

40.     One of the most important projects of Xanthakos's new role is her updating of the Consultant Design Guidelines, a document that guides the work of all CUNY consultants and the Project Management and Technical staff, including that of the other Assistant Directors in DDCM.   This document also provides guidelines used by architectural and engineering consultants hired by the Dormitory Authority of the State of New York ("DASNY") to work on CUNY projects and by Facilities staff at all CUNY campuses.

41.     Xanthakos's work requires a greater level of expertise and skill than the project management work, as well as more knowledge, and a broader perspective and understanding of the design and construction industry, regulatory issues, and CUNY.  Xanthakos has the qualifications, education, skills, and experience to do the project management work, but not all of the project management Assistant Directors have the ability to do the CUNY-wide work Xanthakos does.

42.     In or about 2008, Bergtraum told the staff that Weinshall wanted all of the professionals in DDCM to become LEED-certified.

43.     Xanthakos set up a two-day workshop for the professionals in DDCM about LEED standards and certification procedures.

44.     Xanthakos studied on her own to become LEED-certified.  She took the exam and received an excellent score.  No one in DDCM or FPCM management recognized

Xanthakos's LEED certification. When she told Lemieux, he did not congratulate her and was dismissive. Only a few other employees in DDCM became LEED-certified.

Pay Inequity

45.     Beginning in or about 2007, Xanthakos raised concerns about whether she was paid as much as the male Assistant Directors. Over the years, she raised the issue with Weinshall, Bergtraum, Lemieux, and Vedavarz.

46.     In or about 2001, CUNY hired Anton Wolfshorndl ("Wolfshorndl") as Project Manager. Wolfshorndl is not a licensed architect or engineer.

47.     Initially, Xanthakos was Wolfshorndl's supervisor.

48.     In or about November 2006, a male Interim Vice Chancellor and a male Interim Director promoted Wolfshorndl to Assistant Director. Wolfshorndl was chosen for this promotion over a female Project Manager who was a licensed architect; she left CUNY shortly thereafter.

49.     In or about 2009, Vedavarz told Xanthakos that, according to Lemieux, Xanthakos's pay should be equal to Wolfshorndl's, even though Wolfshorndl was not licensed or LEED-certified, and had less education, experience, and tenure with CUNY than Xanthakos.

50.     Beginning in or about 2007, Xanthakos periodically raised the issue of pay equity with Bergtraum and, when Xanthakos began reporting to him, with Vedavarz. Bergtraum initially told Xanthakos that Xanthakos would "catch up" with the other Assistant Directors, including Wolfshorndl. Bergtraum later claimed that there was a "freeze" on raises. Vedavarz often said that if it was up to him, he would increase Xanthakos's salary, but that she had to speak with Bergtraum, then Vedavarz would quickly change the subject.

51.     In 2016, Xanthakos learned that Wolfshorndl was paid over $11,000 more than her.

52.     Upon information and belief, most other male Assistant Directors are paid even more than Wolfshorndl, and thus more than Xanthakos. In recent years, the male Assistant Directors in DDCM have been Max Pizer ("Pizer"), John Haynes ("Haynes"), and Ralph Carmosino ("Carmosino"). Before becoming Director of Facilities for the Advanced Science Research Center building at City College in late 2014, David Salmon ("Salmon") was also an Assistant Director in DDCM. Carmosino, the only Assistant Director who may make less than Xanthakos, does not have a graduate degree, has been with CUNY for only about nine years, and was not promoted to Assistant Director until 2015 or 2016. Pizer, Carmosino, Haynes, and Salmon are not LEED-certified. Xanthakos has more years of service with CUNY than all of them.

53.     Upon information and belief, Director of Construction Jay Goldstein ("Goldstein") has an annual salary that is $33,000 more than that of Xanthakos. Upon information and belief, Goldstein does not have a four-year college degree and is not licensed. Lemieux hired Goldstein in or about February 2015. Lemieux and Goldstein have hired only men to work in the Construction department. There was one female staff member who had worked in the department since in or about 2010 whose contract was not renewed in 2016.

54.     The professional in DDCM most comparable to Xanthakos is Arthur Fasolino ("Fasolino"), Associate Chief Engineer and Director of Energy and Facility Sustainability. Fasolino started working at CUNY a couple of months after Xanthakos and was promoted to Director in 2008. While Fasolino has engineering degrees and an inactive license, he is not LEED-certified. Like Xanthakos, he has CUNY-wide responsibilities. Fasolino works

933269 v1

on improving energy efficiency of various equipment and other sustainability efforts.   Upon information and belief, Fasolino is paid at least $15,000 more than Xanthakos.

55.   On or about October 30, 2015, Xanthakos met with Vedavarz as part of the annual performance process.   At the meeting, Xanthakos provided Vedavarz with a self-assessment, detailing her substantive accomplishments and setting out measurable goals for the coming year.   Vedavarz told her that Lemieux would not permit more than three of the seven rating categories applied to her to be at the highest level.   Vedavarz did not state whether Lemieux imposed this limitation on other reviews.   Xanthakos again raised her concern about pay equity.

56.   On January 4, 2016, Vedavarz gave Xanthakos her annual performance evaluation for the period ending July 1, 2015.   The review did not detail Xanthakos's accomplishments, did not provide measurable goals, and did not rate her as highly as her performance warranted.   The review also described one area for future goals to be conducting architectural reviews of large and small projects.   When Vedavarz gave the review to Xanthakos, she raised concerns about the areas that were missing or undervalued in her review and how her rating would affect a salary increase, and objected to the inclusion of "small" projects as inconsistent with her position as University Chief Architect.   She said that she was still waiting for the pay equity issue to be addressed.   Although Lemieux signed the review under the statement, "I have discussed this performance accountability assessment document with the employee," Lemieux never discussed the document with Xanthakos.

57.   On January 15, 2016, Xanthakos provided a written response to her performance review to Vedavarz. She also hand-delivered a copy to Sonia Pearson ("Pearson"), Executive Director of Human Resources, by giving the package of materials to Deputy Director

of Human Resources Sujata Malhotra on January 19, 2016.  In her memorandum, Xanthakos

reiterated the concerns she raised with Vedavarz.  She ended by stating, "Finally an ongoing

critical issue for me has been the lack of pay equity.  I raised the issue on numerous occasions

with my supervisor and with the Vice-Chancellor."

58.     Vedavarz's reaction to Xanthakos's memorandum was hostile.   He

repeatedly told her that she "should not have done this."  He said that she would get a response

and that her memorandum would make things worse.  He said this many times over several

weeks.  Xanthakos never received a response to her memorandum.

59.     Upon information and belief, no action was taken to address Xanthakos's

complaint about pay discrimination.

60.     On April 29, 2016, counsel for Xanthakos hand-delivered a letter to

CUNY's General Counsel asserting a claim for pay discrimination.  To date, CUNY has not

taken any action to address the pay disparity.

61.     CUNY has not reviewed Xanthakos's performance since January 1, 2016.

Other Adverse Actions

62.     Lemieux and Vedavarz began to isolate Xanthakos and diminish some of

her responsibilities in or about 2014.

63.     For example, Lemieux has periodically stopped inviting Xanthakos to staff

meetings, and has been hostile when she has asked about it.  All of the male Assistant Directors,

as well as the Directors in DDCM, were invited.  For example, in September 2016, Lemieux sent

invitations for monthly meetings for 2016-17, but excluded Xanthakos.

64.     On or about June 16, 2016, Xanthakos attended a meeting with members

of DDCM management, including Lemieux, and representatives of the DASNY.  Of the dozen

people in the meeting, Xanthakos was the only woman.  At the end of the meeting, two new male senior employees from DASNY joined the meeting to be introduced.  While Lemieux introduced all the male DDCM staff and said something about each of them, he did not introduce Xanthakos.

65.     In 2016, Vedavarz assigned Xanthakos a number of small projects to review.  These projects do not fall within her job description, took Xanthakos away from more significant work, and could have been handled by less senior employees.  He has also been assigning her projects that are primarily engineering projects, with an ancillary architectural role.

66.     Vedavarz took some projects away from Xanthakos, without explanation, and gave them to David Galarza ("Galaraza"), a Project Manager, including, in 2016, a Lehman Nursing School project.  The Lehman Nursing School project is likely to be funded and required work at the early conceptual stage, the type of work at which Xanthakos excels.

67.     In late 2016, Vedavarz hosted a holiday luncheon.  He invited approximately thirteen employees, but did not invite Xanthakos.  Other than two secretaries, all of those invited were men.  When Xanthakos learned about the luncheon and asked Vedavarz about it, he said that she could attend.

68.     Vedavarz applies different standards to Xanthakos than he does to male employees such as Galarza, and becomes hostile when Xanthakos raises any questions about her assignments or differential treatment.

69.     Vedavarz is often unresponsive to Xanthakos's requests for various types of information, including technical mechanical items for the Consultant Design Guidelines and the status of consultant responses to CUNY reviews of significant projects.

Retaliation Relating to Public Accommodations

70.     One of Xanthakos's projects was the Lehman Concert Hall capital project, beginning in fall 2013.   There was an initial consultant study followed by the consultants submitting documents at various design stages.

71.     Concurrently, Xanthakos was assisting the CUNY Legal department, which was addressing questions raised by the U.S. Department of Justice ("DOJ") about the projects triggered by a complaint.

72.     One issue that had concerned Xanthakos in the early design phase related to the requirements for dispersed wheelchair seating.

73.     In a letter dated January 14, 2014, the DOJ identified problems with the proposed wheelchair seating, citing to regulations regarding dispersed seating.

74.     Xanthakos did not believe that the design met the requirements.   She advised CUNY that she did not think the consultant had adequately explored options for dispersed seating or explained why additional dispersed seating was not technically feasible, as they claimed.   Xanthakos recommended working this issue out in advance with the DOJ.   She thought that if the DOJ looked at the proposed solution carefully it would ether accept the proposed layout or would raise some of the same questions Xanthakos had previously raised, which could then be properly addressed.

75.     Xanthakos participated in a meeting with Lemieux, Vedavarz, and Wolfshorndl, to hold a conference call with two CUNY attorneys.   One of the topics was the dispersed wheelchair seating.   After the call ended, Lemieux was dismissive about the concerns raised about the dispersed seating, saying that none of them would be there in ten years to deal with the consequences if there were any problems.   The outcome of the meeting was that the

consultants were directed to revise and strengthen their rationale.  When Wolfshorndl received the revised document, he distributed it to all involved by email, but deleted Xanthakos from the group email and added a Project Manager.

76.     The other issue Xanthakos had raised related to egress for persons in wheelchairs in the front of the concert hall.  The plans had 11 wheelchairs in the front row.  To exit or reach a restroom every person in a wheelchair had to travel one hallway to a single wheelchair lift.   Xanthakos stated that this was both a safety issue and contrary to the requirements for equal access.  She raised this concern as early as January 2014 and continued to raise it through August 2015.

77.     Although the consultants were supposed to respond to comments raised by Xanthakos within two weeks, they or CUNY Project Management often delayed their responses and never responded to Xanthakos's last set of comments in August 2015, despite her repeated follow up, which continued into 2017.

78.     When Xanthakos did not receive responses to the concerns she raised, despite her follow up, she thought the project had been put on hold.  However, she learned that the project was sent out to bid in November 2016 and has been awarded for construction.

79.     Vedavarz was unresponsive or dismissive of the concerns raised by Xanthakos.

<u>FIRST CLAIM FOR RELIEF</u>

<u>Sex Discrimination Under Title IX (Against CUNY)</u>

80.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 79 of this Complaint with the same force and effect as if set forth herein.

81.     Upon information and belief, at all relevant times hereto, CUNY has received, and continues to receive, federal financial assistance.

82.     By the above acts and practices, CUNY has discriminated against plaintiff on the basis of her sex in violation of Title IX.

83.     As a result of CUNY's discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damage and damages for mental anguish, emotional distress and humiliation unless and until this Court grants relief.

84.     CUNY engaged in these discriminatory practices with malice and with reckless indifference to plaintiff's rights protected under federal law.

SECOND CLAIM FOR RELIEF

Retaliation  Under Title IX (Against CUNY)

85.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 84 of this Complaint with the same force and effect as if set forth herein.

86.     Upon information and belief, at all relevant times hereto, CUNY has received, and continues to receive, federal financial assistance.

87.     By the above acts and practices, CUNY has retaliated against plaintiff for her opposition to gender discrimination in violation of Title IX.

88.     As a result of CUNY's retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damage and damages for mental anguish, emotional distress and humiliation unless and until this Court grants relief.

89.     CUNY engaged in these retaliatory practices with malice and with reckless indifference to plaintiff's rights protected under federal law.

THIRD CLAIM FOR RELIEF

Sex Discrimination Under Title VII (Against CUNY)

90.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 89 of this Complaint with the same force and effect as if set forth herein.

91.     By the above acts and practices, CUNY has discriminated against plaintiff on the basis of her sex in violation of Title VII.

92.     As a result of CUNY's discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damage and damages for mental anguish, emotional distress and humiliation unless and until this Court grants relief.

93.     CUNY engaged in these discriminatory practices with malice and with reckless indifference to plaintiff's rights protected under federal law.

FOURTH CLAIM FOR RELIEF

Retaliation Under Title VII (Against CUNY)

94.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 93 of this Complaint with the same force and effect as if set forth herein.

95.     By the above acts and practices, CUNY has retaliated against plaintiff for her opposition to gender discrimination in violation of Title VII.

96.     As a result of CUNY's retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damage and damages for mental anguish, emotional distress and humiliation unless and until this Court grants relief.

97.     CUNY engaged in these retaliatory practices with malice and with reckless indifference to plaintiff's rights protected under federal law.

FIFTH CLAIM FOR RELIEF

Discrimination Under the EPA (Against CUNY)

98.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 97 of the Complaint.

99.     By the acts and practices described above, defendant CUNY, in violation of the EPA, has discriminated against plaintiff by paying male employees higher wages than plaintiff was paid for equal work in a job which required equal skill, effort, and responsibility, and which was performed under similar working conditions.

100.    Plaintiff suffered lost wages as a result of CUNY's willful and unlawful conduct.

SIXTH CLAIM FOR RELIEF

Retaliation Under the EPA (Against CUNY)

101.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 100 of the Complaint.

102.    By the acts and practices described above, defendant CUNY, in violation of the EPA, has retaliated against plaintiff for her opposition to being paid less than men for equal work.

103.    Plaintiff suffered damages as a result of CUNY's willful and unlawful conduct.

SEVENTH CLAIM FOR RELIEF

Sex Discrimination Under Section 1983 (Against the Individual Defendants)

104.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 103 of this Complaint with the same force and effect as if set forth herein.

105.    By the above acts and practices, the individual defendants, in their individual capacities, have discriminated against plaintiff on the basis of her sex, thus depriving her of her rights under the Equal Protection Clause of the 14th Amendment to the United States Constitution, in violation of Section 1983.

106.    As a result of the individual defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damage and damages for mental anguish, emotional distress and humiliation unless and until this Court grants relief.

107.    The individual defendants engaged in these discriminatory practices with malice and with reckless indifference to plaintiff's rights protected under federal law.

EIGHTH CLAIM FOR RELIEF

Retaliation Under Section 1983 (Against the Individual Defendants)

108.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 107 of this Complaint with the same force and effect as if set forth herein.

109.    By the above acts and practices, the individual defendants, in their individual capacities, have retaliated against plaintiff for her opposition to conduct that violated her rights under the Equal Protection Clause of the 14th Amendment to the United States Constitution, in violation of Section 1983.

110.    As a result of the individual defendants' retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damage and damages for mental anguish, emotional distress and humiliation unless and until this Court grants relief.

111.    The individual defendants engaged in these retaliatory practices with malice and with reckless indifference to plaintiff's rights protected under federal law.

NINTH CLAIM FOR RELIEF

Sex Discrimination Under the Executive Law (Against the Individual Defendants)

112.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 111 of this Complaint with the same force and effect as if set forth herein.

113.    By the above acts and practices, the individual defendants have aided and abetted the sex discrimination to which plaintiff has been subjected, in violation of the Executive Law.

114.    As a result of the individual defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damage and damages for mental anguish, emotional distress and humiliation unless and until this Court grants relief.

TENTH CLAIM FOR RELIEF

Retaliation Under the Executive Law (Against the Individual Defendants)

115.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 114 of this Complaint with the same force and effect as if set forth herein.

116.    By the above acts and practices, the individual defendants have aided and abetted the retaliation to which plaintiff has been subjected because of her opposition to sex discrimination and failure to accommodate disabled persons' access to public accommodations, in violation of the Executive Law.

117.    As a result of the retaliatory acts of the individual defendants, plaintiff has suffered and will continue to suffer irreparable injury, monetary damage and damages for mental anguish, emotional distress and humiliation unless and until this Court grants relief.

ELEVENTH CLAIM FOR RELIEF

Sex Discrimination Under the City Law (Against the Individual Defendants)

118.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 117 of this Complaint with the same force and effect as if set forth herein.

119.     By the above acts and practices, the individual defendants have discriminated against plaintiff because of her sex and aided and abetted the sex discrimination to which plaintiff has been subjected, in violation of the City Law.

120.     As a result of the individual defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damage and damages for mental anguish, emotional distress and humiliation unless and until this Court grants relief.

TWELFTH CLAIM FOR RELIEF

Retaliation Under the City Law (Against the Individual Defendants)

121.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 120 of this Complaint with the same force and effect as if set forth herein.

122.     By the above acts and practices, the individual defendants have retaliated against plaintiff for her opposition to unlawful discrimination and the failure to accommodate disabled persons' access to public accommodations and have aided and abetted the retaliation to which plaintiff has been subjected, in violation of the City Law.

123.     As a result of the individual defendants' retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damage and damages for mental anguish, emotional distress and humiliation unless and until this Court grants relief.

THIRTEENTH CLAIM FOR RELIEF

Retaliation Under the ADA (Against Bergtraum in Her Official Capacity)

124.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 123 of this Complaint with the same force and effect as if set forth herein.

125.    By the above acts and practices, Bertraum has retaliated against plaintiff for her opposition to the failure to accommodate disabled persons' access to public accommodations, in violation of the ADA.

126.    Defendant Bergtraum should be ordered to take all steps necessary to stop all retaliation against plaintiff and to restore plaintiff to the terms and conditions of employment she had prior to engaging in protected conduct.

FOURTEENTH CLAIM FOR RELIEF

Retaliation Under the Rehabilitation Act (Against CUNY)

127.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 126 of this Complaint with the same force and effect as if set forth herein.

128.    By the above acts and practices, CUNY has retaliated against plaintiff for her opposition to the failure to accommodate disabled persons' access to public accommodations, in violation of the Rehabilitation Act.

129.    As a result of CUNY's retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damage and damages for mental anguish, emotional distress and humiliation unless and until this Court grants relief.

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

933269 v1

      (a)     declaring that the acts and practices complained of herein are in violation of Title IX, Title VII; the EPA, Section 1983, the ADA, the Rehabilitation Act, the Executive Law, and the City Law;

      (b)     enjoining and permanently restraining these violations;

      (c)     directing defendants to take such affirmative action as is necessary to ensure that the effects of these violations of are eliminated and do not continue to affect plaintiff's employment opportunities;

      (d)     directing defendants to place plaintiff in the position she would have occupied but for defendants' discriminatory and retaliatory treatment of her, and to make her whole for all earnings she would have received but for defendants' discriminatory and retaliatory treatment, including but not limited to, wages, pension, interest and other lost benefits;

      (e)     directing defendants to pay plaintiff compensatory damages for her mental anguish, emotional distress and humiliation;

      (f)     directing defendants to pay plaintiff liquidated damages;

      (g)     directing defendants to pay plaintiff punitive damages;

      (h)     awarding plaintiff pre- and post-judgment interest;

      (i)     awarding plaintiff the costs of this action together with reasonable attorneys' fees; and

      (j)     granting such other and further relief as this Court deems necessary and proper.

DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated: New York, New York
       May 7, 2018

VLADECK, RASKIN & CLARK, P.C.

By:

Anne L. Clark
Attorneys for Plaintiff
565 Fifth Ave, 9th Floor
New York, New York 10017
(212) 403-7300